and we'll move to our second case this morning, Burke v. The Boeing Company. I see Mr. Notisco and Mr. Connealy. Can you both hear me? Yes, Your Honor. All right, Mr. Notisco, can you Mr. Notisco, are you able to hear me? Yes, Your Honor. All right, then you may proceed. Yes, Your Honor. Mr. Notisco, can you turn off the YouTube stream, please? Oh, I'm All right, you may proceed. Good morning, Your Honors. John Nestico for Plaintiff Appellants and I would like to reserve five minutes for rebuttal. That's fine. Your Honors, this case brings us once again to the intersection of ERISA and federal securities laws and a series of related questions. The first being, when must a planned fiduciary who is in possession of material adverse non-public information disclose that information to the plan and its participants? Secondly, can that duty be delegated to an independent fiduciary? And in this case, what must be alleged in the complaint to survive a motion to dismiss and why is this case different from others that have not survived dismissal? A publicly traded company offering a stock to its employees through a qualified retirement plan is subject to the requirements of both federal securities laws and ERISA. The stock that's offered to the plan is made through a public offering, albeit limited to that segment of the public that consists of the company's employees and it's made pursuant to an S-8 registration statement. So it's clear that the securities laws apply to the offering of that stock. But it's also an and therefore, corporate officers who are designated as planned fiduciaries are also subject to ERISA's fiduciary requirements. That is just as a matter of the way the statutes are written. There's no way around it and the Dudenhoffer case... Why isn't... for, you know, for decades now we've been having these cases where companies with employee stock ownership have their stock prices drop from time to time, sometimes dramatically when the company encounters very difficult times such as the tragedies involving the 737 MAX. And the original premise of these cases, in essence, was that ERISA requires planned fiduciaries to use inside information for the benefit of employees. Eventually, it became obvious that that was an untenable position with respect to giving special favored status to the employees. And so now you're arguing, as I understand it, in this kind of new generation of cases, well no, they don't have to do inside trading on behalf of the employees, but they have to go public instantly with adverse information, presenting some very complex problems in this interplay between securities law and ERISA. Frankly, I don't... what's wrong with the kind of cutting the Gordian knot here by delegating the stock selection choices to a neutral outsider, removing the temptation to use inside information and solve the problem that way? What's wrong with that? Your Honor, I think that's a very good point. In fact, I, in my own practice, I think the problem is that you can delegate certain duties to an independent fiduciary, but in this particular case, you've got corporate insiders who remained as planned fiduciaries. But they delegated the stock picking, correct? The delegation to Newport in this case was limited. I mean, I know that the defendants have persistently said it was, they have the exclusive fiduciary duty with respect to the stock fund, but it's pretty clear from the independent fiduciary agreement that the duties of Newport were limited to an examination of public information. Right. That's specified in the agreement. What's wrong with that? There's nothing wrong with that. But what happened in this case is that we've got corporate officers, insiders, who remained as planned fiduciaries. And once they became knowledgeable about adverse public information, they have a duty as described in Dudenhofer and actually other cases preceding Dudenhofer, they have a duty to at least analyze that information and determine whether they have a disclosure obligation under ERISA. Even this, this court has said in the past that a fiduciary has a duty to speak when it's silenced would be misleading. And in the WorldCom case, for example, the district court said that when a corporate insider puts on his ERISA hat, he can't be, he can't simply ignore the information that he's obtained as a corporate insider. But why, why are the employees not sufficiently protected by securities law in this respect? Like every other shareholder. The securities laws don't impose the same level of fiduciary obligation on fiduciaries. And that's pretty clear from all the cases. ERISA itself imposes a much higher duty of responsibility on ERISA fiduciaries. That's just not present when a corporate officer is simply acting as an issuer of stock. So, okay, so we're going back then to the basic premise that employee shareholders have a right to benefit from inside information that public shareholders do not, correct? That's where that argument points. I would say, Your Honor, yes and no. Because the reality is, if an ERISA fiduciary is obligated to make disclosures to plan participants, especially in a plan like the Boeing plan where there are 200,000 participants, that disclosure is necessarily a public disclosure. Right. The court has made it clear that it has to be consistent with the securities laws. So therefore, the expectation is that that plan fiduciary is going to coordinate with the corporation and make those disclosures to the entire public. And your theory is that that should have happened a week after the first crash? Your Honor, we've made that allegation a week after the first crash because it was absolutely clear to Boeing under those circumstances that they knew exactly what the cause of the crash was. Now, the fact is, in this case, it took them months after that. Mr. Nesticco, would you agree with me that Congress wants to make plans? Yes, Your Honor, I agree with that. That's built into ERISA, the tax code, etc. And my concern, you've made policy arguments in your brief, my concern is that if the ERISA theory of, or duty of loyalty, prohibits the delegation in this case and requires executives to use inside information and or make instant public disclosure, then employee stock ownership plans seem to become just an inevitable headache. You're always going to be, any company is going to have occasional drops in its stock price because of bad news, and obviously we are not as bad as this news, but why would a company go forward with employee stock ownership if it's inviting this kind of litigation? Your Honor, two points about that. One is, as I mentioned previously, these senior officers remained as fiduciaries on the Employee Benefits Investment Committee. There's no obligation for a company to put those insiders on such a committee, and there are many reasons that argue in favor of not putting those corporate insiders on the committee, and that would be one easy way for a corporation to avoid these problems. So just put low-level people on the committee? Well, not low-level people, Your Honor, but people who are not going to be, you know, privy to that kind of inside information. You do want members on the committee who are accessible, and very good at doing other things, they're not really available to be on the committee. I mean, I've counseled my clients for years that they should not put corporate insiders on the committee if they're going to offer stock. The other limitation here is that the pleading requirements from doing the offering. Hang on just a second. I'm a little confused. If you think the solution to this problem is to put people on the committee who are not privy to that kind of thing, then why is delegation of investment choices to a neutral outsider any worse than that? Your Honor, I think you're reading something to my answer that's not there. I'm not suggesting that it should be people who don't know anything. Who don't know material inside information that is going to be affecting stock prices, to be more Yes. I think in your example, if you have a committee that's made up of knowledgeable, accessible people who are not statutory insiders, then you've got a perfectly competent committee, and if you want to then delegate the fiduciary responsibility, overall fiduciary responsibility, to an independent fiduciary, then that can be done. And that solves the problem of this supposed conflict between ERISA and the federal securities laws. But the second point I was going to make is that the pleading standard created by Dudenhofer and Amgen is an extraordinary one, and that is that no fiduciary could have determined that some alternative action, and in this case the only alternative action we're pleading is disclosure, that no fiduciary could have determined that was that extraordinary case. Because, in fact, we understand that there's going to be a drop in the stock price because this aircraft company created an aircraft that simply did not fly right. Well, once that became public, then clearly there was going to be a drop in the stock price. But the problem here is that after Boeing knew exactly what the problem was, and continued to mislead the cause of the crash, lying about the cause of the crash, blaming the crash on the pilots, that their reputation was going to be irreparably damaged by that. And not only was it going to create lasting and profound damage to their commercial aircraft business, but it was going to cut across business lines because people are going to feel like Boeing is not an honorable and honest company. And that's the fact pattern that we are suggesting means that no fiduciary could have determined that disclosure here would do more harm than good. And to your point, I think, the whole point of this is to balance having responsible people on the committee, but not putting those corporate officers in a position where they may be forced to disclose something that the corporation, whether for good reason or bad reason, does not want to make the disclosure. But you would agree then that if the makeup of the committee had been a little different, there's no violation? I think I'd have to agree with that. But the fact is, we have individuals on the committee who signed corporate disclosure statements and knew all the way along that what they were disclosing after the crash was misleading and false. And in fact, our position is that under the securities laws, there was an obligation to make this disclosure. But the fiduciary obligation for arrests should have pushed that disclosure a little bit harder. It was just it should have been a little additional incentive to make the disclosure that they're You know, there have been questions in some cases, you know, does an insider have an obligation to make a disclosure of the numerous fiduciary if there is no obligation to make the disclosure under the securities laws? Justice Kagan, in her concurring opinion, suggested that there may be circumstances when they should. The brief of the United States and the gender case also suggested the same thing, that there may be circumstances in which an individual who is not subject to the federal securities laws disclosure requirements may have to raise the issue with those people who are responsible for those disclosures in order to push the disclosure forward. Now, that's not this case because the individuals that we're dealing with on this committee were the individuals responsible for the securities laws disclosure. And under 10 B five, they clearly had an obligation to correct their misleading statements. But why aren't your clients satisfied with securities fraud claims? Because our clients don't have to give up. We don't have to give up our arrest of fiduciary claims. That's the benefit. And you brought up the history previously of these cases. And in virtually all these cases, there were parallel cases alleging a breach of fiduciary duty for maintaining the securities law cases. But, you know, that's the right that these plaintiffs have because they are supposed to get the benefit of having a fiduciary who is subject to a very high standard of care protecting their interests with inside information, with inside information. If that fiduciary determines that disclosing the inside information would not do more harm than good. Okay. And at this point, Your Honor, I think I would like to reserve my reserve five minutes for rebuttal. That's fine. Thank you, Mr. Nestor. Mr. Keneally. Thank you, Chief Judge Sykes, and may it please the court. Michael Keneally, on behalf of defendants. Plaintiffs argue that just days after the Lion Air crash, ERISA obligated benefits plan committee members to announce to the world that the 737 Max was unsafe to fly, knowing that this would immediately cause massive losses in plan participants' retirement savings. This case is a prime example of why, as the Supreme Court says, the motion to dismiss is an important mechanism for weeding out this type of meritless claim. Here, the district court identified two independent grounds for dismissing the second amended complaint, and plaintiffs have no answer to either of those problems. First, plaintiffs failed the threshold requirement of challenging conduct that defendants took in a fiduciary capacity. The investment committee here engaged an independent fiduciary to ensure the prudence of the Boeing stock fund, eliminating the possible source of a on defendant's part. And second, plaintiffs fall far short of satisfying the Supreme Court's demanding Dudenhoffer test, and their arguments contradict the rulings of each of the many circuits that have applied that test. Let me begin with the threshold question, because the Supreme Court held in Pegram that the first question in every fiduciary breach case under the fiduciaries took action that adversely affected plan participants' interests, but whether they were acting in a fiduciary capacity with their fiduciary hat on when they took that challenged conduct. Here, plaintiffs cannot make that showing or even allege it, because, as their complaint admits, the investment committee appointed Newport as an independent fiduciary. In other words, here, the defendants did precisely what plaintiffs in these types of cases often say they had to do but didn't, appoint an independent fiduciary to evaluate the company's financial position and the prudence of the company's stock fund neutrally, without any sort of affiliation to the company. And I know of no case, not Dudenhoffer, not any of the cases since Dudenhoffer, and none of the cases before Dudenhoffer, where a court has allowed the possibility for liability based on a defendant who appointed an independent fiduciary to make these types of decisions. Plaintiffs' main response to that is to posit a non-delegable duty to disclose. But ERISA doesn't have a freestanding corrective disclosure duty. That is what the securities laws are for. And all the courts who have addressed any type of a potential freestanding duty to disclose have rejected it. Whether that's a duty to disclose to participants, as we've touched upon already, that would violate insider trading laws. So Howell versus Motorella, this court rejected that. Whether it's disclosing to another fiduciary, the Second Circuit rejected that argument in Reinhart. Or whether it's disclosing to the public itself, as the Eighth Circuit said in Allen versus Wells Fargo recently, imposing such a duty would essentially require fiduciaries to provide investment advice to plaintiff participants. And that's not what ERISA requires. And all this makes sense given Dudenhofer's account of how a corrective disclosure obligation could theoretically arise in this context. Normally, if you have an imprudent investment option in a plan, the thing to do is to take it out of the plan. But when you have insider information, that's what's telling you that that's the reason the investment option is imprudent, the insider trading laws would prevent you from taking that action. So the next best thing might be to disclose the inside information that you know. But if you don't have the oversight of the investment fund in the first place, that duty to disclose just doesn't arise. So here defendants- Can I ask you, I don't know about my colleagues, but I've been dealing with these employee stock ownership, stock price, stock drop cases for about 20 years now. And I would expect that if this works to prevent these kinds of cases from going forward, that is the delegation to an outside fiduciary, everybody either is already doing it or will soon be doing it. What can you tell me or tell us about the state of the world in that respect? Well, I'm not sure that prediction's right, Your Honor, because I don't know of too many companies that actually do this. And there's a pretty, I think, common sense reason why companies are reluctant to hire an independent fiduciary for this type of investment. And that is because it would be effectively giving an outsider, non-biased outsider, the control over whether that company's own stock is a worthwhile investment. Not just a worthwhile investment, but a responsible investment. And that is a lot of authority to give away if you're a So we don't often see too many of these kinds of arrangements. The exception would be potentially in circumstances where the company's already pretty close to going under. So for instance, the Fourth Circuit's DeFelice versus U.S. Airways case. The company there appointed an independent fiduciary kind of long into the class period. In fact, the plaintiffs stopped the class period on the day the independent fiduciary took over, acknowledging that this is the end of their claim against the defendants. So we don't see these kinds of arrangements too often in the case of a healthy company. But the fact that Boeing did it here, I think, is a testament to their wanting to go above and beyond what the minimum amount that ERISA would require. Unless there are other questions about the independent fiduciary issue, I'll turn to I would like to ask you a little bit more about that, Mr. Keneally, in essence to ask you what guardrails you see that are needed and present to prevent abuse of that device. I'm not sure there are too many, Your Honor, because as some of the questions earlier noted, we already have a full set of laws that govern truth on the market and the obligations of a company not to mislead its investors. The securities laws already exist and they're targeted for this particular purpose. And I think it's a false premise to suppose that ERISA plan participants should have some sort of better status, or the companies that happen to have an ESOP, their investors should have some sort of extra layer of protection to make sure that when companies have inside information that might not be captured by the securities laws, which obviously, as Your Honors know, don't require immediate disclosure of every type of material information, there's some reason that ERISA would need to provide more protection than that. I don't think that that's true. And so I don't think that there is a need for more safeguards in this particular area. There are, of course, obligations whenever a fiduciary is appointed of the appointing fiduciary to monitor that appointment and just make sure that the fiduciary is doing what they're hired to do. But here, plaintiffs have never alleged anything about Boeing's failure to monitor Newport. And in fact, in their reply brief on the final page, they specifically say that they are not raising a claim for failure to monitor Newport. They're raising a failure to monitor the stock fund kind of claim. So there is that built-in protection under ERISA Section 405C, but it's not really at risk here. And I think that that, combined with the securities laws, is enough to ensure that ERISA employee stock ownership plan investors are protected as much as the law requires. Let me turn then to the Dudenhofer point quickly, because that's where most of the cases on this topic have been focused, again, because plaintiffs have ensued plans that have independent fiduciaries. They have ensued defendants who appointed independent fiduciaries. So in Dudenhofer, as the Court knows, the Supreme Court recognized Congress's support for employee stock ownership plans and stressed the need for significant Rule 12b6 of these kind of complaints to make sure that only the plausible ones get through. And so under Dudenhofer, plaintiffs must allege in the complaint itself an alternative action that is first consistent with the securities laws, and second, that a prudent fiduciary couldn't have seen as doing more harm than good to the plan. And the Supreme Court met what it said in this test, as we know from the Amgen case, where it summarily reversed because the Ninth Circuit didn't apply that test. And lower courts are in that this test means that the action must be so clearly beneficial that no prudent fiduciary could conclude it would be more likely to harm the fund than to help it, that those decisions come from the Fifth Circuit, the Sixth Circuit, the Eighth Circuit, and the Ninth Circuit. And that's a demanding standard for good reason. Again, the securities laws already occupy a lot of this space, and they limit what fiduciaries can do on the insider trading front, but also they protect plan participants from fraud. And these types of corrective disclosures in particular, when that's the alternative action that plaintiffs point to, are designed to hurt the fund by present, at least in the short term, by immediately causing a significant stock drop. And so the only court that has allowed these cases to go, a case to go forward past the pleading stage since Amgen is the Jander case, which the plaintiffs rely heavily on. But there are five critical differences between Jander and this case. The first is that there was no independent fiduciary in Jander. And then the second is that the plaintiffs made plausible allegations that disclosure in that case was actually inevitable because of the defendant company's, I'm sorry, the company's longstanding plans to sell off one of its businesses. And the Jander court emphasized those allegations as particularly important in distinguishing that case from the where a fiduciary is weighing disclosure versus a realistic possibility of non-disclosure. And since Jander, the Second Circuit has confirmed that that was an important allegation in Jander in the Varga case that we cite from earlier this year. The sale in Jander was a triggering event that really made the disclosure inevitable. And relatedly, Jander also made clear that it was necessary and disclosure would not have been premature. And that is an impossible claim to make about this case because the complaint itself acknowledges that there were investigations ongoing about the 737 MAX throughout the entirety of the class period and well beyond. And so courts in that sort of circumstance have said that investigation is something that a prudent manager of a stock fund would await the conclusion of before making a potentially rash or half-formed disclosure on their own. And so that's the third difference. And then the fourth and fifth differences are related to each other. In Jander, the non-disclosed information was quite specific because the plaintiff's plausibly alleged a gap violation. And the defendants plausibly had knowledge of that problem because they were the ones responsible. They were in the accounting department of the company. They were responsible for that gap violation. And we have nothing like that here. In fact, it's entirely unclear what the non-public information is that plaintiffs think should have been disclosed. They point to, quote-unquote, safety issues. But the closest they come to describing those are issues related to the aircraft's angle of attack sensors and the response of the maneuvering characteristics augmentation system. But their own complaint acknowledges on November 6th, the day before the start of the class period, that Boeing issued an operations manual bulletin that talked about the potential for errors in the angle of attack sensors and the response that would happen with the flight control system. And I'd point the court, if it's interested in this issue, to paragraphs 118 and 119 of the complaint. So unclear what the fiduciaries should have disclosed. And it's unclear why they would have had any other information or knowledge about more particularized issues. We have very conclusory allegations of knowledge. And under this court's Pew versus Tribune decision, that is not enough, even setting aside Dudenhofer. Mr. Connealy, as you read Dudenhofer, could you describe a scenario that would satisfy it? It's a little hard for me to put myself in the plaintiff's ERISA lawyer point and come up with a successful claim. The reason I ask is that the Supreme Court has indicated this is not an empty set. Well, I don't know if I agree with that, Your Honor. In Dudenhofer, they say that the presumption of prudence was improper because it would make these cases impossible to plead outside of a company that's in very dire financial straits. And I'm not suggesting that. I think if you had a situation where we knew that all of the people buying into the company's ESOP were new investors, so, for instance, a new company, that would be a situation as well where the calculation might be different because there wouldn't be so many people, maybe none, who are participants in the stock fund who would immediately be harmed by an irregular disclosure outside of the context of what securities laws would require. So there are scenarios. It's hard to identify them in the abstract. I think gender comes about as close as you can to one of them. But I don't think that the Supreme Court was committing itself to a pretty broad set. It might end up being a null set, but they didn't want the presumption of prudence to be the reason why plaintiffs were failing because they didn't think that that presumption was grounded in pleading standards generally or in the statute here. So we also raised in our brief the issue of consistency between ERISA and the securities laws. But unless the Court has any questions about that issue or any other questions for me, I'd be happy to rest on the briefs. All right. Thank you very much, Mr. Keneally. Mr. Nestico, rebuttal. You're muted. You're still on mute, Mr. Nestico. Thank you, Your Honor. I'm actually rather shocked and wondering whether Mr. Keneally actually read the complaint because, in fact, this case fits squarely within multiple issues that he raised about the Jander case. Boeing designed a plane that could not fly right without special avionics put in place to make the plane fly in what was essentially a constant climbing position because the way they installed the engines, that plane could not fly straight and level the way the plan was designed to start off with. So they installed the MCAS system that was designed to take over if the plan got a stall warning and then failed to tell the pilots about the MCAS system. And after the the Lion Air crash, what Boeing knew immediately once the flight data recorder was recovered was exactly what was what happened was exactly what the plane was designed to do. So the MCAS system took over. The pilots did not know what was happening, and they got into a fight with the system because the system was continuously pushing the nose down. The plane was on takeoff, and so they were supposed to be climbing out of the system and ultimately crash the plane. Nothing in any of the investigations that took place afterwards disclosed anything that Boeing did not already know because, in fact, that was exactly the way they designed the plane to operate. So when Mr. Keneally says that, oh, well, there were specific gap issues in Jander, that's exactly the case here because Boeing knew exactly what was wrong with the plane as soon as they got those flight data recorded, the data from the flight data recorder. The inevitability of the disclosure. Of course, the disclosure of these design defects was going to be inevitable because there were multiple government agencies examining what happened with these crashes. And again, the investigations proved exactly what Boeing already knew. So it was inevitable that the design flaws were going to be uncovered by these investigations. And instead, rather than assisting in those investigations, rather than trying to preserve the safety for the flying public and the crews of these airlines, they continued to deceive the agencies and the flying public about what they already knew about these airplanes. To raise another point, Judge Hamilton, that you raised about why we're pursuing the ERISA claims. There actually is, if you look at the countrywide securities litigation that happened a few years ago, class counsel in that case, in the securities law case, actually moved to exclude plan participants from that securities law class on the basis that the plan participants did not buy their stock in a public offering. Now, I think that was clearly a wrong decision, but at the same time, it raises a risk that plan participants would be excluded from that securities class action. I would think just creating two classes would be a pretty easy solution to that problem, don't you? Yes, Your Honor, it's possible, but again, there'd be no reason for our plaintiffs to give up the extra duty, the claims that they have regarding the extra duty as a fiduciary. Regarding the, going back to the issue about the independent fiduciary, as I mentioned earlier, the independent fiduciary agreement expressly limits Newport's obligations to the review of public information. If there's anything that Dudenhofer stands for, it's that statutory insiders who are planned fiduciaries, like Mr. Verbeck and Mr. Donelick in this case, have an obligation to at least determine whether disclosure of that inside information is necessary in order to protect the interest of plan participants. Now, again, I want to be clear, every case that is alleging a stock drop is going to have a drop in the stock price. The question is, would disclosure have prevented additional damage? And in this case, there was significant additional damage because the public simply does not trust Boeing at this point. And not only are the sales of their airplanes damaged by this, but the entire reputation of the company has been damaged by their callous disregard for the safety of the flying public. In fact, had they disclosed it at any time within a couple of months after the first crash, it likely would have prevented the second crash. And the fact is, they still didn't make the disclosure up until the point where agencies around the world grounded the airplanes. And so there's no telling what their recalcitrance might have caused in the absence of the action taken by these other agencies. And I'd be happy to answer any further questions, but I see my time has expired. All right. Thank you very much, Mr. Nestico. Our thanks to both counsel. The case is taken under advice.